# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

|  |  |
|---|---|
| MICHAEL LEWELLEN,<br><br>                              Plaintiff,<br><br>v.<br><br>MERRICK GARLAND, Attorney General for the United States, in his official capacity,<br><br>                              Defendant. | Case No. 4:25-cv-30 |

## COMPLAINT

1.    Michael Lewellen wants to publish new cryptocurrency software that he created to coordinate crowdfunding campaigns for charities and other projects. The problem? The federal government has begun *criminally prosecuting* people for publishing similar cryptocurrency software, calling it unlicensed "money transmitting" under 18 U.S.C. §1960(b)(1)(B).

2.    Though this strained interpretation of §1960 might further the anti-crypto views of certain federal officials, it has no sound basis in the statutory text. The federal government's criminal prosecutions are based on a mistaken view of what constitutes unlicensed "money transmitting." Lewellen's planned cryptocurrency software will be non-custodial, meaning that it will not give Lewellen any control, possession, or direction over the cryptocurrency that users put through the software. It will simply be

a tool that *others* can use to move money, like an envelope used to move checks in the mail.

3.      Federal "money transmitters," like Western Union or Venmo, are entities that control, possess, and direct money on behalf of others—typically through accounts run by the money transmitter. The laws against unlicensed money transmission seek to regulate intermediaries in the sensitive business of moving customers' money, not technologists who create tools that allow users to move money themselves. Consistent with this view, the federal government itself has told cryptocurrency software publishers like Lewellen that unless they exercise "total independent *control* over the value" being moved, they are not money transmitters. *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001, at 15 (May 9, 2019), perma.cc/8M5Z-QY2D (emphasis added). Lewellen will not exercise any control over any value being moved, let alone total independent control, so he is not a money transmitter.

4.      Undeterred, the federal government is now betraying its own representations to the public by criminally prosecuting people who publish non-custodial cryptocurrency software, like Lewellen's. In these criminal prosecutions, the government takes the position that creating tools that allow others to move cryptocurrency is a federal criminal offense. *See United States v. Storm*, 23-cr-430 (S.D.N.Y.); *United States v. Rodriguez*, 24-cr-82 (S.D.N.Y.). Section 1960, under this new view, does "*not* require the business to have control" of the cryptocurrency being

moved. Gov't Opp. to MTD, *United States v. Storm et al.*, 23-cr-430, ECF No. 53, at 34 (S.D.N.Y. Apr. 26, 2024) (emphasis added).

5.      The government's position is wrong and ultra vires. As a matter of plain meaning, money transmission requires control over the money being moved, which is not present when someone publishes non-custodial software like Lewellen's. The government's reading also extends the money-transmitting laws beyond what the Constitution allows. It makes them tools to punish the mere publication of software, rather than the later transmission of funds, in violation of the First Amendment. And it renders these laws unconstitutionally arbitrary and vague, in violation of the Fifth Amendment.

6.      Lewellen needs prospective relief from this Court or else he must either not go forward with his business plan or face five years in prison. He seeks a declaration that his planned activity is lawful and an injunction preventing Defendant from bringing any action against him.

### THE PARTIES

7.      Plaintiff, Michael Lewellen, is an individual residing in Tarrant County, Texas.

8.      Defendant Merrick Garland is the Attorney General of the United States. He is sued in his official capacity. Garland is charged with enforcing federal law, including the federal money-transmitting laws.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction under 28 U.S.C. §1331 because this case arises under federal law.

10.    Venue is proper here under 28 U.S.C. §1402(a)(1) and §1391(e) because Lewellen resides in Tarrant County, Texas.

## BACKGROUND

### I.    Federal law prohibits unlicensed money transmission, which it defines narrowly.

11.    Federal law prohibits unlicensed money transmitting. It does so under two interrelated statutory provisions, codified at 18 U.S.C. §1960 and 31 U.S.C. §5330, as well as their implementing regulations. Both provisions penalize people for running an unlawful "money transmitting business."

12.    The criminal provision, 18 U.S.C. §1960, prohibits conducting an "unlicensed money transmitting business" and penalizes violators with five years in prison. Its operative provision states:

> Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

18 U.S.C. §1960(a).

13.    For a §1960 conviction, the defendant must have engaged in a "money transmitting" business. The activity of "money transmitting" is defined within the statute to include "transferring funds on behalf of the public by any and all means." §1960(b)(2).

14.   For a §1960 conviction, the defendant's money transmitting must have been "unlicensed." Under §1960, the term "unlicensed" is defined to mean any of three things. First, as relevant to this lawsuit, it is defined under §1960(b)(1)(B) to mean that the money-transmitting business "fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." In other words, a §1960(b)(1)(B) conviction requires that the defendant violated the civil money-transmitting provision, 31 U.S.C. §5330, discussed at length below.

15.   Second, "unlicensed" can also refer to a money transmitting business that fails to comply with state law. §1960(b)(1)(A). That prong is not relevant to this lawsuit because Lewellen will comply with state law.

16.   And third, "unlicensed" can refer to a money-transmitting business that "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." §1960(b)(1)(C). That prong is also not relevant to this lawsuit because Lewellen will not transport known criminal funds.

17.   Finally, for a §1960 conviction, the defendant's money transmitting must be a "business."

18.   As for the civil provision, 31 U.S.C. §5330, it imposes registration requirements on anyone who owns a "money transmitting business" and punishes violators with $5,000 fines per day. Its operative provision states:

> Any person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury not later than the end of the 180-day period beginning … the date on which the business is established.

31 U.S.C. §5330(a)(1).

19.     Failure to comply with this civil provision, §5330, is a necessary predicate to a conviction under the criminal provision, §1960(b)(1)(B).

20.     To be liable under §5330, someone must engage in a "money transmitting business." 31 U.S.C. §5330(a)(1). A "money transmitting business" for §5330 purposes is defined as a business that itself meets the following three requirements, the first two of which are relevant here.

     a.     First, it engages in a specified money-transmitting activity. Those activities cover a business that "provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments," as well as "any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency." 31 U.S.C. §5330(d)(1)(A).

     b.     Second, the business "is required to file reports under section 5313." 31 U.S.C. §5330(d)(1)(B). Section 5313, in turn, authorizes Treasury to require reports of "financial institutions" by regulation. 31 U.S.C. §5313. As relevant here, a "financial institution" required by regulation to file reports (and therefore potentially subject to §5330) includes any "money services business."

31 C.F.R. §1010.100(ff). A "money services business" includes a "money transmitter." 31 C.F.R. §1010.100(ff)(5). And a "money transmitter" is "a person that provides money transmission services," which is further defined to require the "acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means;" or "any other person engaged in the transfer of funds." 31 C.F.R. §1010.100(ff)(5).

c.    Third, it must be "not a depository institution," which is not relevant to this case. 31 U.S.C. §5330(d)(1)(C).

21.    In summary, to establish liability under §1960(b)(1)(B), the government must clear several independent and significant hurdles to establish that the defendant's money-transmitting activity was the type that Congress subjected to criminal punishment. The government must, directly under the criminal provision, show that the defendant "transferr[ed] funds on behalf of the public by any and all means." 18 U.S.C. §1960(b). It must, under the civil provision that is incorporated into the criminal provision, show that the defendant "accept[ed] currency, funds, or value that substitutes for currency and transmitt[ed] the currency, funds, or value that substitutes for currency by any means," or "engage[d] in the transmission of currency, funds, or value that substitutes for currency." §5330(d)(1)(A); (d)(2). And it must, under the regulations that are incorporated into the criminal provision through the civil provision, show that the defendant "accept[ed] currency, funds, or other value that substitutes for currency from

7

one person and … transmi[tted] … currency, funds, or other value that substitutes for currency to another location or person by any means," or was "engaged in the transfer of funds." 31 C.F.R. §1010.100(ff)(5) (incorporated by §1960(b)(1)(B) via §5330(d)(1)(B) and 31 U.S.C. §5313).

22.     Any business that does not independently satisfy all of these requirements is not subject to punishment under §1960(b)(1)(B).

23.     Section 1960 has been amended several times, but its definition of "money transmitting" has remained unchanged. Since 1992, "money transmitting" has meant "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." *See* Pub. L. 102–550, 106 Stat. 3672, 4057 (Oct. 28, 1992). Congress has chosen not to update it to include non-custodial cryptocurrency software, or any other non-custodial technology.

24.     The money-transmitting laws are meant to encompass businesses like Western Union and Venmo that hold and move money on their customers' behalf.

## II.    Lewellen intends to write and publish Pharos, a non-custodial cryptocurrency software.

25.     Michael Lewellen is a cryptocurrency and blockchain technology expert and entrepreneur.

26.     Lewellen is a lifelong resident of the Dallas-Fort Worth metropolitan area. He lives in Tarrant County.

27.     Lewellen started his own cryptocurrency consulting practice ten years ago, and then began attending the University of Texas at Dallas, where he majored in computer science and co-founded a student Blockchain Club.

28.     Lewellen is also a Founding Partner of Tarski Technologies, a blockchain technology firm providing smart contract software services.

29.     He has more than eight years of blockchain experience working as a technical consultant to companies, with a focus on smart contract development and security. He has helped secure billions of dollars' worth of cryptocurrency for clients through his work at OpenZeppelin, a blockchain cybersecurity firm.

30.     Lewellen has consulted on the development of major smart contracts on ethereum—a widely used cryptocurrency network—and has led the resolution of security issues affecting tens of millions of dollars in cryptocurrency.

31.     He has been consulted to provide high-stakes cryptocurrency and blockchain services by major multinational companies like Thomson Reuters, Toyota, and Verizon.

32.     Lewellen has extensive experience helping cryptocurrency projects with software development related to crowdfunding, which is of particular interest to him.

33.     Lewellen plans to publish a new cryptocurrency software product that is near and dear to his heart and expertise. His new software product, called Pharos, allows a large group of cryptocurrency users to transfer cryptocurrency from their individual addresses to a recipient through the software according to certain predetermined rules,

and in a manner that promotes privacy. Specifically, it enables cryptocurrency crowdfunding campaigns, like for charitable causes or business ventures, which are not adequately or reliably supported by existing software. Pharos allows people to route their cryptocurrency through the software according to rules that help fundraising campaigns achieve their goals in a trusted, reliable, and privacy-protecting manner.

34.    Although Lewellen writes and publishes the Pharos software, he will never have control over the cryptocurrency that goes through Pharos.

35.    Cryptocurrency is a digital system of money. Tens of millions of Americans use cryptocurrency. It allows them to participate in the economy on fair and equal terms, enables complex and reliable transactions, and promotes economic freedom. *See* Reeves, *46 Million Americans Now Own Bitcoin, as Crypto Goes Mainstream*, Newsweek (May 11, 2021), perma.cc/JW3L-59LB.

36.    Cryptocurrency operates using open-source code, which is a computer program that anyone can view, copy, and use without the need to purchase it or seek a license. Users can generate a pseudonymous account to transact using cryptocurrency. Their transactions are posted to a public ledger, or blockchain. The transactions recorded on the blockchain are not themselves linked to individuals' identities, but there are various ways that a person's cryptocurrency transactions can be linked to that person.

37.    People can also write and publish software that lets cryptocurrency users transact more easily or in more advanced ways. Cryptocurrency software can be

published to cryptocurrency blockchains or online. Cryptocurrency software published to a blockchain is also referred to as a "smart contract." Generally, once writers publish software, anyone can use the software with their own cryptocurrency.

38.    Cryptocurrency software can help users more easily and effectively move cryptocurrency between accounts and to intended recipients on their desired terms. Software that helps users move their cryptocurrency can be made so that the users themselves retain control over the cryptocurrency as they move it. The writer or publisher of the software can write it so that he does hold the cryptocurrency in a custodial account, but he can also write it so that he does not ever control or possess or direct the cryptocurrency that users move through the software.

39.    Cryptocurrency software can also help users transact more privately. Privacy-enhancing software is important to cryptocurrency users because cryptocurrency transactions on the public blockchain can be linked to a person's real-world identity. For example, if an employee asks an employer to pay him in cryptocurrency, he must share his account information with the employer. The employer, or anyone else who connects an account to a person, can then see the person's entire history of cryptocurrency transactions, including sensitive or long-ago transactions, by tracing that account on the public blockchain. This exposure risks the user's safety and privacy. To respond to this problem, people write and publish software that makes it more difficult to track a person's cryptocurrency use, such as by clearing the links between past and future transactions.

40.     The cryptocurrency industry makes up a major portion of the American economy. About 20% of Americans have purchased cryptocurrency, amounting to 52 million Americans. Thousands of American businesses now accept cryptocurrency as a form of payment. Instead of buying goods and services with cash or credit cards, people can now buy them with cryptocurrency instead. *The Use of Cryptocurrency in Business*, Deloitte (June 2023), perma.cc/R9ZR-7Y5G; Hall, *Can You Buy A House With Bitcoin?*, Bitcoin Magazine (May 26, 2022), tinyurl.com/3w6vz2wp; Terrett, *DC Coffee Chain Debuts Crypto Payments with Coinbase Partnership*, Yahoo! Finance (Mar. 20, 2024), perma.cc/BLH2-N2FW. The cryptocurrency industry has a market capitalization of over $3 trillion. *See Today's Cryptocurrency Prices by Market Cap*, CoinMarketCap (accessed Jan. 8, 2025), perma.cc/K3W5-VPY6.

41.     Lewellen intends to create a new cryptocurrency software product, called Pharos. Pharos will be published to ethereum, a popular cryptocurrency platform. Pharos will allow people to more easily and effectively move cryptocurrency on desired terms. Specifically, Pharos is designed to enable permissionless and non-custodial crowdfunding campaigns.

42.     Pharos fills an important gap in the existing cryptocurrency financial system. Lewellen has seen that there are "public goods" that many people would be happy to contribute to financially, but only if supporters can be assured that the full amount to fund the public good will be raised. In other words, they will contribute if they can be assured that the public good will be deployed. Partial fundraising for these

projects would not be acceptable. Examples include building infrastructure such as a bridge or hospital, building a war monument, funding an event like a festival or conference, funding a medical trial or scientific study, filing an advocacy lawsuit, or funding a movie production or other cultural good. Nobody wants to pay for these endeavours without knowing that others will pay enough to complete the project.

43.     To address this dilemma, Pharos would deploy the concept of "assurance contracts." An assurance contract is a system in which contributors commit money that is released to the planned recipient only if the fundraising goal is met by a certain date. Otherwise the money is returned to the would-be contributors. By promising a refund if the required amount is not raised, assurance contracts encourage more public goods to be funded through voluntary contributions. *See* Tabarrok, *The Private Provision of Public Goods via Dominant Assurance Contracts*, 96 Pub. Choice 345, 345-48 (1998).

44.     But this kind of system has traditionally had a significant flaw: It has required an intermediary to hold the funds during the fundraising time period, to be the judge of whether the target amount was met, and to forward the funds to the fundraiser or return them to the contributors. Traditional intermediation is expensive, complicated, and potentially untrustworthy, which is why there has not been more use of "assurance contract" schemes.

45.     Lewellen's Pharos addresses these challenges because it creates a decentralized, "intermediary-less" system that executes everybody's desired terms automatically. Pharos offers a transparent, accessible smart contract for fundraising

campaigns, enabling anyone to set a clear funding target and a fixed fundraising period. If the target is reached by the campaign's end, the cryptocurrency flows to the campaign's recipient. If not, the system refunds the original contributors. This straightforward logic ensures that every campaign operates on its own merits and that contributors pay with confidence. Either their contribution will go to a fully-funded project, or they will get a refund.

46.    Once Pharos is published, anyone will be able to use the software to create a fundraising campaign. An online user interface, hosted at a website Lewellen will create, will make it easy for a user to set the parameters and launch a new campaign. The campaign will designate a recipient (the entity to receive cryptocurrency if the goal is met). It will designate the required amount of cryptocurrency to be raised (the funding goal). And it will designate an end time for the fundraising period. Once launched, the campaign will be able to accept contributions until the contribution period ends.

47.    During the campaign's active period, supporters can contribute cryptocurrency to help reach the campaign's goal. The supporters send their cryptocurrency contributions directly to the campaign, which will be published to a unique cryptocurrency address. Supporters who contribute before the campaign ends will do so with the knowledge that, if the goal is met, the recipient will receive this cryptocurrency, and that if it is not met, the supporters will be entitled to a refund. Their cryptocurrency contributions are securely stored at an immutable smart contract until the campaign concludes.

48.    The cryptocurrency that goes through Pharos will *never* be controlled or possessed or directed by Lewellen. Lewellen will have no control or possession or direction over the cryptocurrency as it moves from the contributors to the recipients.

49.    Even the smart contract that hosts the cryptocurrency itself will be immutable, meaning Lewellen will not be able to control, alter, or edit even that software, let alone control the underlying cryptocurrency that it governs.

50.    If the total cryptocurrency collected meets or exceeds the campaign's funding goal on time, the campaign is considered successful. In that case, a predetermined fee goes to Lewellen, and the rest of the cryptocurrency goes to the designated recipient. If the campaign does not meet its funding goal, supporters can reclaim their cryptocurrency, and no fee goes to Lewellen.

51.    Through Pharos, users will move cryptocurrency between and among addresses to help facilitate important economic transactions. But they will do so without allowing Lewellen any control or possession or direction over the cryptocurrency.

52.    Privacy is important to cryptocurrency users generally and especially to those donating to political or charitable causes that will go through Pharos. Lewellen therefore intends to incorporate an advanced privacy technology called zero-knowledge cryptography that prevents supporter addresses from being publicly identifiable.

53.    Lewellen also intends to offer advanced privacy features, such as being able to prove to supporters that deposited cryptocurrency was not yet withdrawn as

well as the ability to let the campaign recipient perform compliance checks on the source of supporters' cryptocurrency without compromising their privacy.

54.    Lewellen is ready and able to make his Pharos software available to the public. He has written a thorough and detailed plan for his business and is prepared to execute it. He intends to market and promote Pharos software and to receive regular fees from its use. He intends to pay for and maintain a website from which users can access an optional interface to use Pharos. A major nonprofit has already told Lewellen that it wants to use Pharos for fundraising campaigns.

55.    Lewellen will not operate without a state-required license where applicable, §1960(b)(1)(A), or involve the knowing transportation or transmission of known criminal funds, §1960(b)(1)(C). Therefore, his only conceivable liability under the criminal provision would require that he failed to comply with the civil money-transmitting provision and its regulations. *See* 18 U.S.C. §1960(b)(1)(B).

56.    Lewellen will not register his business as a federal money transmitter within 180 days. He cannot do so because it will be impossible to comply with the reporting requirements that registration would demand, given that he, as a mere publisher of non-custodial software, will not have access to the information about users that compliance would require.

57.    Lewellen's business will affect interstate commerce in some "manner or degree." §1960(b)(1).

### III. Federal money-transmitting law does not reach those who write and publish non-custodial cryptocurrency software.

58.    Though the government thinks Lewellen's plan is criminal, the government is wrong. As a matter of plain meaning, confirmed repeatedly by the federal government itself, the federal money-transmitting laws do not cover those who write and publish non-custodial cryptocurrency software like Pharos.

59.    The plain meaning of the money-transmitting laws does not cover someone who writes and publishes a software product that allows other people to move their cryptocurrency from one person or address to another, where that software writer does not move the cryptocurrency himself or have any possession or control over the cryptocurrency.

60.    The definitions of "transfer," "transmit," and "accept"—required actions with respect to cryptocurrency for a money-transmitting offense—all suggest that someone who does those things has possession or control over the object being moved. As a matter of common sense, someone does not "transfer," "transmit," or "accept" some object when he creates the tool that other people use to move it, like Lewellen does with Pharos. For example, if someone drives his money from one place to another in a Ford truck, Ford does not "transfer" or "transmit" or "accept" the money. That conclusion holds even if Ford manufactured the truck to assist that person with moving money, such as by adding armor and other security features. Likewise, if a paper

company prints security envelopes that other people use to mail checks, the paper company does not "transfer" or "transmit" or "accept" the checks.

61.    Instead, to "transfer," §1960(b), means "to convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of," a definition that demands possession, control, or direction over the thing transferred. *Transfer*, Black's Law Dictionary (10th ed. 2014). The noun version of "transfer," 31 C.F.R. §1010.100(ff)(5), also demands possession, control, or direction. It means "[a]ny mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease or creation of a lien or other encumbrance," and "every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property or with an interest in property." *Transfer*, Black's Law Dictionary (10th ed. 2014).

62.    Likewise, and in even stronger terms, to "transmit," §5330(d)(1); 31 C.F.R. §1010.100(ff)(5), means to "send or transfer (a thing) from one person or place to another," which requires control or possession or direction of the thing. *Transmit*, Black's Law Dictionary (10th ed. 2014). And to "accept," §5330(d)(1)(A); 31 C.F.R. §1010.100(ff)(5), means "to receive (something offered) willingly," which cannot be done without control or possession or direction of the thing. *Accept*, Merriam-Webster Online (2025). The entire statutory and regulatory framework falls apart if those terms

are defined to include the creation of tools that allow *others* to transfer, transmit, and accept things.

63.    The federal government's agency in charge of the civil provision, the Financial Crimes Enforcement Network, has issued repeated public guidance on how cryptocurrency software writers like Lewellen should comply with the money-transmitting laws. FinCEN's guidance has repeatedly made clear that a software writer like Lewellen is not a money transmitter and is not subject to 31 U.S.C. §5330 (and therefore not subject to 18 U.S.C. §1960(b)(1)(B) either).

64.    In 2019, FinCEN addressed two business models that both describe the software here. *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019), perma.cc/8M5Z-QY2D.

65.    First, it addressed creators of software products that allow users to move their cryptocurrency in a privacy-enhancing manner, like Lewellen. In a section entitled "anonymizing software provider," FinCEN said that "suppliers of tools (communications, hardware, or software) that may be utilized in money transmission, like anonymizing software, are engaged in trade and not money transmission." *Id.* at 20. FinCEN said unambiguously that "an anonymizing software provider *is not a money transmitter*." *Id.* (emphasis added). It contrasted an anonymizing software provider with an "anonymizing services provider," whom it said would be a money transmitter precisely because (unlike the software provider) the anonymizing services provider "accepts" and "transmits" the cryptocurrency himself in accounts under his control,

rather than publishing software that allows other people to move their cryptocurrency. *Id.* at 19-20.

66.    Second, FinCEN addressed creators of cryptocurrency "wallets," which are products that allow people to store and move their cryptocurrency. *Id.* at 15-17. It explained that creators of "*unhosted* wallets"—software that allows people to make crypto transactions themselves, without giving control or possession or direction of their cryptocurrency to the creator of the wallet—are not money transmitters. They do not own the cryptocurrency being moved, the cryptocurrency is not stored in accounts belonging to the software creators, the users interact directly with the payment system rather than going through the software creator, and the software creator does not have "total independent control over the value." *Id.* at 15.

67.    FinCEN's analysis of these two business models applied its longstanding general rule that software creators who lack control over money being moved are not money transmitters. That rule is reflected in numerous other sources that were published for cryptocurrency developers to plan their conduct around.

68.    For example, in 2014, FinCEN said that "the production and distribution of software, in and of itself, does not constitute acceptance and transmission of value," and therefore is not money transmission, "even if the purpose of the software is to facilitate the sale of virtual currency." *Application of FinCEN's Regulations to Virtual Currency Software Development and Certain Investment Activity*, FIN-2014-R002, at 2 (Jan. 30, 2014), perma.cc/4B2Q-XKEV. In other words, if someone just creates software that

allows people to move their cryptocurrency—but he himself never controls that money—then he is not a money transmitter. *See id.*

69.    Likewise, in 2013, FinCEN said that, for someone to be a money transmitter under its regulations, he needed to "accept" *and* "transmit" the cryptocurrency. It was insufficient if he "transferred" the cryptocurrency, to the extent that transferring could be any broader than acceptance and transmission. *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001, at 4-5 (Mar. 18, 2013), perma.cc/5WCK-BLGF.

70.    FinCEN also set out in 2019 general criteria for determining whether cryptocurrency businesses that established intermediary services between an owner of value and the value itself were money transmitters. It said that someone being a money transmitter depended on (1) who owns the value; (2) where the value is stored; (3) whether the owner interacts directly with the payment system where the value is stored; and (4) whether the person acting as an intermediary has "total independent control over the value." *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001, at 15 (May 9, 2019), perma.cc/8M5Z-QY2D. Whenever a cryptocurrency software creator did not have "total independent control over the value," FinCEN took the position that he was not a money transmitter.

71.    The plain meaning of 18 U.S.C. §1960 does not reach non-custodial cryptocurrency software because §1960's language was originally written to reach no further than existing state laws, which did not require a license for such software.

72.    The public has consistently understood FinCEN's guidance to protect non-custodial software creators like Lewellen. *See, e.g.*, Barabander, Tuminelli, and Chervinsky, *Through the Looking Glass: Conceptualizing Control and Analyzing Criminal Liability for Unlicensed Money Transmitting Businesses under Section 1960*, Int'l Academy of Financial Crime Litigators Working Paper No 3 (2024).

73.    Notably, the Fifth Circuit has already held that creators of immutable software that other people use to move cryptocurrency between accounts do not have property rights in that software, including rights based on possession or control, such as would be necessary for them to transfer, transmit, or accept cryptocurrency. *Van Loon v. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024).

74.    And for many years, the government refused to punish anyone under the criminal or civil money-transmitting provisions unless that person exercised control or possession or direction over the money that was allegedly transmitted. Instead, under ordinary money-transmission actions, the defendant "receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates." *United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999).

## IV.    DOJ now prosecutes as money transmitters those who write and publish non-custodial cryptocurrency software.

75.    But DOJ now interprets the money-transmitting laws to *not* require that the defendant exercise any control or possession or direction over the money being transmitted. It has brought several criminal prosecutions for conspiracy to violate

§1960(b)(1)(B) against cryptocurrency software writers reflecting this far broader theory of money transmitting. *See United States v. Storm et al.*, 23-cr-430 (S.D.N.Y.); *United States v. Rodriguez et al.*, 24-cr-82 (S.D.N.Y.).

76.     The criminal defendants in those cases created software products, like Pharos, that allowed cryptocurrency users to move cryptocurrency between addresses.

77.     The defendants in those cases created software products, like Pharos, that enhanced cryptocurrency users' privacy in moving their cryptocurrency.

78.     And the defendants in those cases created software products, like Pharos, that meant that they would never have any control over the cryptocurrency being moved.

79.     For example, DOJ prosecuted the creators of "Tornado Cash," a non-custodial software that allowed users to move their cryptocurrency from one account to another with privacy-enhancing features that helped sever the link between their past transactions and future transactions on the public blockchain. *See United States v. Storm et al.*, 23-cr-430 (S.D.N.Y.).

80.     As another example, DOJ prosecuted the creators of the "Samourai Wallet," another non-custodial software product that enabled users to similarly move their cryptocurrency among accounts more privately. *United States v. Rodriguez et al.*, 24-cr-82 (S.D.N.Y.).

81.     Contrary to FinCEN's guidance and the plain meaning of the money-transmitting laws, DOJ took the position that the creation of non-custodial software

for moving cryptocurrency from one person or address to another *itself* constituted money transmission under 18 U.S.C. §1960, 31 U.S.C. §5330, and the implementing regulations.

82.     DOJ explicitly argued in these cases that "Section 1960 does not require the business to have control of the funds." Gov't Opp. to MTD, *United States v. Storm et al.*, 23-cr-430, ECF No. 53, at 34 (S.D.N.Y. Apr. 26, 2024). Instead, it was sufficient that the defendant created software and an optional interface used by others to move cryptocurrency, that the defendant paid for and had control over the interface (not the cryptocurrency), and that the defendant marketed the product and received payments sometimes when people used the service. *Id.*

83.     These two criminal cases were brought in the Southern District of New York, but the defendants wrote and published their software from elsewhere. The cases were brought in New York on the thinnest grounds, like the fact that a law-enforcement employee intentionally used the software from New York. *See* ECF No. 4, Sealed Superseding Indictment, at ¶34, *United States v. Rodriguez et al.*, 24-cr-82 (S.D.N.Y. Feb. 14, 2024). DOJ brought the prosecutions in New York based on that one government-manufactured use, even though the software writers lived in "France" and "Florida, Pennsylvania, or the United Kingdom." *See id.* at ¶¶2-3.

84.     Because Lewellen's software will be available for anyone to use, it can likewise be used from any jurisdiction in the United States.

85.    Garland issued a public statement about the prosecution of the Tornado Cash creators. He explained that the prosecution should serve as a threat to similarly situated software creators: "These charges should serve as yet another warning to those who think they can turn to cryptocurrency to conceal their crimes and hide their identities, including cryptocurrency mixers: it does not matter how sophisticated your scheme is or how many attempts you have made to anonymize yourself, the Justice Department will find you and hold you accountable for your crimes." *Tornado Cash Founders Charged with Money Laundering and Sanctions Violations*, Dep't of Justice (Aug. 23, 2023), perma.cc/PY8N-73NA. DOJ posted about the prosecution on social media. *See* U.S. Department of Justice (@TheJusticeDept), X (Aug. 23, 2023, 2:03 p.m.), perma.cc/2EG2-3WXK.

86.    Observers have pointed out that DOJ's expansive interpretation of the money-transmitting laws in these prosecutions resembles DOJ's other attempts to expansively interpret criminal statutes to cover conduct that it dislikes, which the Supreme Court has repeatedly condemned. *See* Hirshman, McGuire, and Wang, *Tornado Cash and the Limits of Money Transmission*, Stanford Blockchain Club (Dec. 13, 2024), perma.cc/KAX6-L3YC.

87.    DOJ's interpretation of the money-transmitting laws to cover such non-custodial software generated widespread shock and alarm in the cryptocurrency world that had long relied on the government's clear and correct guidance saying the opposite. *See, e.g.*, Van Valkenburgh, *DOJ's New Stance on Crypto Wallets is a Threat to Liberty and the*

*Rule of Law*, Coin Center (Apr. 29, 2024), perma.cc/LV4E-F7JF ("it has come as quite a surprise that the Department of Justice is suddenly intent on charging wallet developers criminally for unlicensed money transmission even if they exercise no actual control over the assets their users choose to secure with their software"); Written Testimony of A. Tuminelli, *Decoding DeFi: Breaking Down the Future of Decentralized Finance*, House Subcommittee on Digital Assets, Financial Technology and Inclusion, at 12 (Sept. 10, 2024) ("via criminal charges against developer Roman Storm, the DOJ staked out for the first time a position contradictory to FinCEN's as to what constitutes money transmission"), perma.cc/DDE5-P4ZC; *accord* Anthony, *Samourai Charges Mark Chilling Moment for Financial Privacy*, Cato Inst. (Apr. 30, 2024), perma.cc/LFJ2-TWHA.

88.    Senators from both parties wrote Garland to express their "grave concerns" that "DOJ's unprecedented interpretation of this statute in the context of non-custodial crypto asset software services contradicts the clear intent of Congress and the authoritative guidance of the Department of the Treasury's Financial Crimes Enforcement Network." Letter to Hon. Merrick Garland from Sen. Lummis & Sen. Wyden, *Re: Money Transmitting Business Registration and Non-Custodial Crypto Asset Software*, at 1 (May 9, 2024), perma.cc/9AKY-PZRX. As the Senators explained, "[t]he statutes and regulations are clear that direct receipt and control of assets are required elements of money transmission." *Id.* at 1. And therefore, "non-custodial crypto service providers cannot be classified as money transmitter businesses because users of such services retain sole possession and control of their crypto assets." *Id.* at 2. Indeed, "this limiting

factor is essential, otherwise a wide range of additional services such as internet service providers or postal carriers could inadvertently be caught in the definition of a money transmitting business since they routinely send, receive and process information and messages regarding payments." *Id.* at 1.

**V.    Lewellen is entitled to relief.**

89.    Lewellen credibly fears enforcement because DOJ has sought criminal penalties against these very similar writers and publishers of similar cryptocurrency software. *See United States v. Storm et al.*, 23-cr-430 (S.D.N.Y.); *United States v. Rodriguez et al.*, 24-cr-82 (S.D.N.Y.).

90.    They have based those prosecutions on broad theories that would implicate Lewellen's planned software.

91.    DOJ has not disavowed enforcement against Lewellen or similarly situated entities.

92.    One of the district courts adjudicating the criminal prosecutions has already agreed with DOJ's theory, and ruled that money transmission does *not* require control. *See* ECF No. 84, Transcript, at 21, *United States v. Storm et al.*, 23-cr-430 (S.D.N.Y. Oct. 3, 2024) ("this Court agrees with the government that control is not a necessary requirement of the Section 1960 offense").

93.    DOJ is wrong and its position should ultimately lose, but that it actively enforces its overbroad view of the law creates a substantial threat to Lewellen. *See Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 485 (9th Cir. 2024) (requiring "substantial threat of

enforcement, and not the likelihood that any such enforcement action would ultimately lead to sanctions").

94.     Lewellen wants his rights adjudicated now because he cannot operate under this threat. The Declaratory Judgment Act exists for precisely this reason.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Declaratory Judgment Act, 28 U.S.C. §2201 et seq.**

95.     Plaintiff repeats and realleges all prior allegations.

96.     The Declaratory Judgment Act "afford[s] one threatened with liability an early adjudication without waiting until [its] adversary should see fit to begin an action after the damage has accrued." *Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) (cleaned up); 28 U.S.C. §2201(a). In other words, it "allow[s] prospective defendants to sue to establish their nonliability." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959).

97.     The DJA plaintiff is entitled to have his rights adjudicated if the Court "would have jurisdiction had the declaratory relief defendant been a plaintiff seeking a federal remedy." *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997).

98.     This Court would have jurisdiction in an action brought by DOJ because the money-transmitting statutes that it enforces are federal statutes. *See* 31 U.S.C. §5311 *et seq.*; 18 U.S.C. §1960; 28 U.S.C. §1331. Lewellen also has an independent cause of

action because he seeks nonmonetary relief against Garland for actions beyond his statutory authority.

99.    To establish liability under §1960(b)(1)(B), the government must satisfy three requirements about the defendant's money-transmitting activity, but it cannot satisfy any as to Lewellen.

100.    Lewellen will not "transfe[r] funds on behalf of the public by any and all means." 18 U.S.C. §1960(b). He will not transfer anything, but rather will publish non-custodial software that allows others to move their own cryptocurrency. And even if he did transfer anything, it would not be "funds" as that term is interpreted under the money-transmitting laws.

101.    Lewellen will not "accep[t] currency, funds, or value that substitutes for currency and transmi[t] the currency, funds, or value that substitutes for currency by any means," or "engag[e] in the transmission of currency, funds, or value that substitutes for currency." §5330(d)(1)(A); (d)(2). Again, he will not accept or transmit anything, but rather will publish non-custodial software that allows others to move their own cryptocurrency.

102.    And Lewellen is not a "money transmitter," or any other "money services business," under the Bank Secrecy Act regulations. Lewellen will not "accep[t] currency, funds, or other value that substitutes for currency from one person and … transmi[t] … currency, funds, or other value that substitutes for currency to another location or person by any means," or "engag[e] in the transfer of funds." 31 C.F.R. §1010.100(ff)(5)

(incorporated by §1960(b)(1)(B) via §5330(d)(1)(B) and 31 U.S.C. §5313). He will not accept, transmit, or transfer anything, but rather will publish non-custodial software that allows others to move their own cryptocurrency. He will not exercise any control or possession or direction over that cryptocurrency. And if he did accept or transmit anything, his facts and circumstances, and the limitations on these regulations, would still exclude him from the reach of these regulations. 31 C.F.R. §1010.100(ff)(5)(ii).

103.    To the extent that these interpretive questions pose a close call, the rule of lenity resolves any ambiguity about the scope of "transfer," "transmit," and "accept." Those terms are construed narrowly to apply only to those actions in which the defendant controls the money. "The rule of lenity is a 'time-honored interpretive guideline.'" *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc), *aff'd*, 602 U.S. 406. The Fifth Circuit has "applied it many times to construe ambiguous statutes against imposing criminal liability," including in challenges to agency interpretations of those statutes. *Id.* Lenity is especially important in challenges to agency interpretations of statutes because it "preserves the separation of powers 'by maintaining the legislature as the creator of crimes.'" *Id.* at 470. Whether the Court encounters the statute "in a criminal or noncriminal context, the rule of lenity applies." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). DOJ must therefore prove that "transfer," "transmit," and "accept" all *unambiguously* cover Lewellen's writing and publication of non-custodial cryptocurrency software, which it cannot do. Furthermore, the fairness and notice principles underlying the rule of lenity counsel that the federal money-transmitting laws should not be

interpreted to punish someone for complying with the federal government's own regulatory guidance on how to comply with its money-transmitting laws.

104.   An enforcement action against Lewellen would be clearly in excess of DOJ's statutory authority.

105.   DOJ has no discretion to bring such an action because it has no authority to do so.

## COUNT TWO
## First Amendment

106.   Plaintiff repeats and realleges all prior allegations.

107.   Under DOJ's interpretation of the money-transmitting laws, those laws would no longer punish the act of moving cryptocurrency, but instead the act of writing and publishing software. The government's punishment of writing and publishing software triggers First Amendment scrutiny, which it cannot survive.

108.   It is well established that writing and publishing software is protected First Amendment activity. "Communication does not lose constitutional protection as 'speech' simply because it is expressed in the language of computer code. Mathematical formulae and musical scores are written in 'code,' i.e., symbolic notations not comprehensible to the uninitiated, and yet both are covered by the First Amendment." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445-46 (2d Cir. 2001). Therefore, publishing "computer source code," including the "unrestricted distribution of

encryption software through [a] web site," is protected by the First Amendment. *Junger v. Daley*, 209 F.3d 481, 484-85 (6th Cir. 2000).

109.    For example, in *Bernstein v. Department of State*, a software writer won a First Amendment challenge to a national-security law that prevented him from posting cryptographic software online. 945 F. Supp. 1279 (N.D. Cal. 1996). The court held that the law "cover[ed] speech protected by the First Amendment" because it required a license to "post[] software on the internet," including "logic flows, algorithms and source code" that could be used by others to encrypt and decrypt data in transactions that the government viewed as potentially dangerous. *Id.* at 1283-92.

110.    First Amendment protections for software writers reflect the First Amendment's broad coverage of technical and informational publication. The First Amendment protects creating a for-profit website, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), disseminating drug-prescription data for profit, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558 (2011), publishing prices, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763 (1976), disseminating technical scientific information, *e.g.*, *United States v. Progressive, Inc.*, 467 F. Supp. 990 (W.D. Wis. 1979), and publishing "[i]nstructions, do-it-yourself manuals, [and] recipes." *Bernstein*, 922 F. Supp. at 1435; *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995) ("information on beer labels" is speech); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985) (plurality op.) (credit report is "speech").

32

111.    "[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles" of the First Amendment "do not vary." *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 790 (2011).

112.    So while Lewellen writes and publishes his software on the internet, he receives no less constitutional protection than if he wrote and published instructions for a new financial tool in a hardcopy book.

113.    Of course, software can also execute instructions and have real-world effects. Courts understand that "computer code can instantly cause a computer to accomplish tasks and instantly render the results of those tasks available throughout the world via the Internet." *Corley*, 273 F.3d at 451. But "[a] recipe is no less 'speech' because it calls for the use of an oven, and a musical score is no less 'speech' because it specifies performance on an electric guitar.... [T]he fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment. The information conveyed by most 'instructions' is how to perform a task." *Id.* at 446-48. "The fact that a medium of expression has a functional capacity should not preclude constitutional protection," given that First Amendment protection "is not reserved for purely expressive communication." *Junger*, 209 F.3d at 484-85. Of course, if Lewellen's writing and publishing of the Pharos software were not protected by the First Amendment, then the government could compel him to write and publish such software against his will,

which few would defend. "If the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (cleaned up). If it were required, the government has no substantial government interest unrelated to the suppression of free expression for which it is necessary to burden Lewellen's writing and publishing of code.

114.    It does not matter that people who use the software pay a small fee to Lewellen. "While the burdened speech results from an economic motive, so too does a great deal of vital expression." *Sorrell*, 564 U.S. at 567. Under the First Amendment, the government could not put an author in jail for writing a book just because the readers paid for it. *See also United States v. United Foods, Inc.*, 533 U.S. 405, 410-411 (2001) (applying "First Amendment scrutiny" where speech effects were not incidental and noting that "those whose business and livelihood depend in some way upon the product involved no doubt deem First Amendment protection to be just as important for them as it is for other discrete, little noticed groups"); *303 Creative LLC*, 600 U.S. at 594 (It does not "mak[e] a difference" that "Ms. Smith offers her speech for pay and does so through 303 Creative LLC…. Does anyone think a speechwriter loses his First Amendment right to choose for whom he works if he accepts money in return? Or that a visual artist who accepts commissions from the public does the same? Many of the world's great works of literature and art were created with an expectation of compensation.").

115.    If the money-transmitting laws covered the writing and publishing of non-custodial and immutable software, then Lewellen would be punished for the content of the computer code that he wrote and published—and then put beyond his control for others to use—which is protected First Amendment expression.

116.    Therefore, this Court should hold directly under the First Amendment that the money-transmitting laws are unconstitutional insofar as they apply to Lewellen's writing and publishing of non-custodial and immutable software. Or, it should hold that the money-transmitting laws cannot cover the writing and publishing of non-custodial and immutable software, applying the constitutional-avoidance canon to favor what is already the better interpretation of the statute. *See Pub. Citizen v. DOJ*, 491 U.S. 440, 466 (1989) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 247 (2012) ("A statute should be interpreted in a way that avoids placing its constitutionality in doubt.").

### COUNT THREE
### Fifth Amendment

117.    Plaintiff repeats and realleges all prior allegations.

118.    If DOJ's interpretation of the law to cover non-custodial cryptocurrency software is allowed, then the law is unconstitutionally vague as applied to Lewellen's planned activity. It would violate due process.

119.   The due process clause prohibits arbitrary enforcement of laws. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). "The due process clause has been held to protect individuals from the arbitrary application of statutes." *Gartrell v. Knight*, 546 F. Supp. 449, 451-52 (N.D. Ala. 1982) (collecting cases); *see also, e.g.*, *Vitek v. Jones*, 445 U.S. 480 (1980).

120.   It is arbitrary and a violation of due process for the government to fail to give notice to parties of the meaning of its laws. The government must provide regulated parties "fair warning of the conduct [a regulation] prohibits or requires." *Christopher v. Smithkline Beecham Corp.*, 567 U.S. 142, 156 (2012); *see also Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids'"). A regulated party should be able to "revie[w] the regulations and other public statements issued by the agency" and then "identify, with 'ascertainable certainty,' the standards" with which it is expected to conform. *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995).

121.   The government has interpreted the money-transmitting laws to mean two contradictory things. Under its FinCEN guidance, the money-transmitting laws do not cover non-custodial cryptocurrency software. Under DOJ's criminal prosecutions, the money-transmitting laws do cover non-custodial cryptocurrency software.

122. DOJ's interpretation, if permitted, would make the statute unconstitutionally vague. If the government's legal representatives themselves cannot hold an internally consistent position as to whether the publisher of non-custodial cryptocurrency software "transfers" or "transmits" or "accepts" money under the law, then those terms are unconstitutionally vague as applied to the publisher of non-custodial cryptocurrency software.

123. The principle against arbitrary enforcement also makes it a due-process violation for the government to punish someone for something that the government itself said was legal. In *Raley v. Ohio*, the Supreme Court held that due process precluded the conviction of defendants for refusing to answer questions asked by a state investigating commission which itself had assured them that they had a privilege under state law to refuse to answer. 360 U.S. 423 (1959). In *Cox v. Louisiana*, the Supreme Court held that an individual could not be punished for demonstrating near a courthouse where the highest police officials of the city had advised the demonstrators that they could meet. 379 U.S. 559 (1965); *see also, e.g.*, *Columbia Broadcasting Sys. v. United States*, 316 U.S. 407, 422 (1942) (agency regulations on which individuals are "entitled to rely" bind agency and are therefore ripe for judicial review). A similar principle applies to regulatory statements: "It is basic due process that the Government cannot set up regulations and then disregard them." *Brown v. United States*, 377 F. Supp. 530, 539 (N.D. Tex. 1974). Due process is "implicated [when] an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered

substantially because of their violation by the agency." *United States v. Caceres*, 440 U.S. 741, 752-53 (1979).

124.    The federal government has both authorized Lewellen's business model (under the FinCEN guidance) and sought criminal penalties against people like Lewellen who adopt that business model (in DOJ's prosecutions). The government's behavior is worse than ordinary failure to give fair warning because it is contradicting itself and because it is punishing people who follow its formal guidance. That is quintessential arbitrary behavior.

125.    The vagueness concerns are exacerbated here because DOJ's interpretation of the law also implicates protected First Amendment expression. *See Smith v. California*, 361 U.S. 147, 151 (1959) ("stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech").

126.    Therefore, this Court should either hold under the constitutional-avoidance canon that the money-transmitting laws cannot cover Lewellen's writing and publishing of non-custodial and immutable software. *See Pub. Citizen v. DOJ*, 491 U.S. at 466. Or it should hold directly that the money-transmitting laws violate due process insofar as they are construed to apply to non-custodial and immutable software.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    A declaration that Lewellen's planned cryptocurrency business does not violate the federal money-transmitting laws;

B.    An injunction preventing the enforcement of the federal money-transmitting laws against Lewellen's planned cryptocurrency business;

C.    An order awarding Lewellen his costs in this action, including attorneys' fees; and

D.    Any other relief that the Court deems just and proper.

Dated: January 16, 2025                     Respectfully submitted,


                                            */s/ Cameron T. Norris*
J. Abraham Sutherland (pro hac vice         Cameron T. Norris
application forthcoming)                     (TN State Bar No. 33467)
106 Connally Street                         Jeffrey S. Hetzel (pro hac vice application
Black Mountain, NC 28711                    forthcoming)
Telephone: 805.689.4577                     Zachary Grouev (pro hac vice application
                                            forthcoming)
                                            CONSOVOY MCCARTHY PLLC
                                            1600 Wilson Boulevard, Suite 700
                                            Arlington, VA 22209
                                            Telephone: 703.243.9423

                        *Attorneys for Plaintiff*