**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

MICHAEL LEWELLEN,

  *Plaintiff*,

v.

PAMELA BONDI, in her official capacity as
Attorney General of the United States,

  *Defendant*.

Case No. 4:25-cv-00030-O

**BRIEF OF PARADIGM OPERATIONS LP, DEFI EDUCATION FUND,
BITCOIN POLICY INSTITUTE, BLOCKCHAIN ASSOCIATION, CRYPTO
COUNCIL FOR INNOVATION, THE DIGITAL CHAMBER, SOLANA POLICY
INSTITUTE, AND UNISWAP FOUNDATION AS AMICI CURIAE
IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS**

## CORPORATE DISCLOSURE STATEMENT[1]

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, amici curiae disclose that no amicus organization has a parent corporation, and no publicly held corporation owns 10% of more of any amicus organization's stock.

---

[1] No person other than amici curiae authored any part of this brief or contributed money to fund its preparation or submission.

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT....................................................................i

TABLE OF AUTHORITIES............................................................................... iii

INTEREST OF AMICI CURIAE ...............................................................................1

INTRODUCTION ..................................................................................................3

ARGUMENT.........................................................................................................4

I.     SOFTWARE DEVELOPERS DO NOT "TRANSMIT" MONEY. ........................4

     A.    Section 1960 Applies Only to Those Who Exercise Custody or Control over Others' Funds. ..........................................................................5

     B.    Developers of Non-Custodial Cryptocurrency Software—Who Never Take Control of Assets—Do Not Transmit Funds on Behalf of Others. ..............................................................................................8

II.    THE GOVERNMENT IS WRONGLY PROSECUTING DEVELOPERS UNDER A NOVEL AND SWEEPING INTERPRETATION OF § 1960...........10

III.   THE GOVERNMENT'S IMPROPER INTERPRETATION OF § 1960 IS CHILLING INNOVATION IN THE CRYPTOCURRENCY INDUSTRY........15

     A.    The Government's § 1960 Prosecutions Have Generated Legal Uncertainty, Chilling Development of Lawful Cryptocurrency Tools. ......15

     B.    Declaratory Relief Is Appropriate to Settle § 1960's Meaning Without Requiring Law-Abiding Developers to Face the Risk of Incarceration. ........................................................................................20

CONCLUSION ...................................................................................................22

CERTIFICATE OF SERVICE.................................................................................23

# TABLE OF AUTHORITIES

**Page**

CASES

*Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*,
   70 F.4th 914 (5th Cir. 2023) ......................................................... 20, 21, 22

*Dep't of Treasury v. Haider*,
   No. 14-cv-9987 (S.D.N.Y. Dec. 18, 2014) .................................................. 18

*Nat'l Rifle Ass'n of Am. v. Magaw*,
   132 F.3d 272 (6th Cir. 1997) ............................................................. 20, 21

*Risley v. Universal Navigation Inc.*,
   690 F. Supp. 3d 195 (S.D.N.Y. 2023), *aff'd in part and vacated in part*
   *on other grounds*, 2025 WL 615185 (2d Cir. Feb. 26, 2025) ........................................ 9

*Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*,
   585 F.3d 58 (2d Cir. 2009) ................................................................... 6

*Twitter v. Taamneh*,
   598 U.S. 471 (2023) ......................................................................... 13

*Umphress v. Hall*,
   133 F.4th 455 (5th Cir. 2025) ............................................................... 21

*United States v. Bah*,
   574 F.3d 106 (2d Cir. 2009) .................................................................. 6

*United States v. Faiella*,
   39 F. Supp. 3d 544 (S.D.N.Y. 2014) .................................................... 6, 14, 15

*United States v. Rodriguez*,
   No. 24-cr-0082 (S.D.N.Y.) ................................... 3, 7, 10, 11, 14, 16, 17, 20

*United States v. Storm*,
   No. 23-cr-0430 (S.D.N.Y.) ........................... 3, 10, 11, 12, 13, 14, 16, 19, 20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Velastegui,*
　199 F.3d 590 (2d Cir. 1999) ................................................................. 6

*Van Loon v. Dep't of the Treasury,*
　122 F.4th 549 (5th Cir. 2024) ........................................................ 8, 9, 18

*Wisconsin Cent. Ltd v. United States,*
　585 U.S. 274 (2018) ........................................................................... 14

**STATUTES**

18 U.S.C. § 1960 ..............................................................................passim

　§ 1960(b)(1)(A) ........................................................................... 5, 12

　§ 1960(b)(1)(B) ...................................................................... 5, 12, 18

　§ 1960(b)(1)(C) ........................................................................... 5, 12

　§ 1960(b)(2) ............................................... 3, 5, 8, 11, 14, 18, 19

Bank Secrecy Act ("BSA") ............................................ 6, 7, 8, 14, 18

　31 U.S.C. § 5318 ............................................................................. 18

　31 U.S.C. § 5330 .................................................................... 6, 7, 18

Declaratory Judgment Act ............................................................ 20, 22

**REGULATIONS**

31 C.F.R. § 1010.100(ff) ................................................................. 7, 8

31 C.F.R. § 1022.210 ........................................................................ 18

31 C.F.R. § 1022.320 ........................................................................ 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

OTHER AUTHORITIES

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ................................. 14

Benjamin Gruenstein, Evan Norris, & Daniel Barabander, *Assessing the Tornado Cash Indictment against FinCEN's 2019 Guidance Applying Money Transmission Rules to Crypto Businesses*, NYU School of Law (Oct. 26, 2023) ...................................................................................... 16

Black's Law Dictionary (12th ed. 2024) ........................................................ 5, 6

Daniel Barabander, Amanda Tuminelli, & Jake Chervinsky, *Through the Looking Glass: Conceptualizing Control and Analyzing Criminal Liability for Unlicensed Money Transmitting Businesses under Section 1960*, International Academy of Financial Crime Litigators (Dec. 2024)............. 11, 16

DeFi Education Fund, *AML/CFT Part 1: Where Government Meets DeFi* (Aug. 20, 2022) ....................................................................................... 16

FinCEN, FIN-2019-G001, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies* (May 9, 2019) ................................................................................................ 7, 8, 13

*How Does Tornado Cash Work?*, Coin Center (Aug. 25, 2022)...................................... 10

I. Priess & A. Gilbert, *Why Privacy Advocates Argue the Conviction of Tornado Cash Dev Alexey Pertsev 'Harms Everyone'*, DLNews (May 16, 2024) .............................................................................................. 17

Jason Brett, *Roman Storm Case: Will Jailing a Coder Stifle U.S. Crypto Growth?*, Forbes (Jan. 30, 2025) ............................................................. 17

Jeremy B. Zucker et al., *FinCEN, Treasury Dep't Affirm Regulatory Regime for Convertible Virtual Currencies*, Dechert LLP (May 2019)....................... 16

Letter from Coalition of Industry Participants to Tim Scott et al. (Mar. 26, 2025) .......................................................................................... 16, 17, 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Letter from Cynthia M. Lummis & Ron Wyden to Merrick Garland (May 9,
2024) ................................................................................................................. 17

Marco Santori, *What is Money Transmission and Why Does it Matter?*,
Coin Center (Apr. 7, 2015) ............................................................................... 16

Mark W. Rasmussen et al., *FinCEN Consolidates Guidance on Virtual
Currencies*, Jones Day (Jun. 2019) ................................................................. 16

Memorandum from Deputy Att'y Gen. Todd Blanche to All Department
Employees (Apr. 7, 2025) ................................................................................. 19

Mike Nonaka, Jenny Konko, & Cody Gaffney, *FinCEN Issues Guidance to
Synthesize Regulatory Framework for Virtual Currency*, Covington &
Burling LLP (Nov. 2019) .................................................................................. 16

Mirella A. deRose, *Tying It All Together: FinCEN Consolidates Several
Years of Cryptocurrency Guidance*, King & Spalding (May 21, 2019) ...................... 16

Nicholas Anthony, *Samourai Charges Mark Chilling Moment for Financial
Privacy*, Cato Inst. (Apr. 30, 2024) .................................................................. 17

Peter Van Valkenburgh, *DOJ's New Stance on Crypto Wallets is a Threat
to Liberty and the Rule of Law*, Coin Center (Apr. 29, 2024) .................................... 17

Peter Van Valkenburgh, *FinCEN's New Cryptocurrency Guidance Matches
Coin Center Recommendations*, Coin Center (May 9, 2019) .................................... 16

Satish M. Kini et al., *Applying the Bank Secrecy Act Framework to
Convertible Virtual Currency*, Debevoise & Plimpton LLP (May 28,
2019) ................................................................................................................. 16

vi

## INTEREST OF AMICI CURIAE

**Paradigm Operations LP** is a U.S.-based investment firm that backs entrepreneurs building innovative crypto companies and protocols, including those developing non-custodial, peer-to-peer software enabling decentralized finance.  **The DeFi Education Fund** is a U.S.-based nonpartisan nonprofit advocating for sound policy for decentralized finance, which is part of the cryptocurrency ecosystem.  **The Bitcoin Policy Institute** is a nonpartisan, nonprofit organization researching the policy and societal implications of Bitcoin and emerging monetary networks; its mission is to provide rigorous, evidence-based analysis to policymakers and the public, promoting informed decisions that foster innovation and protect individual rights in the evolving digital economy.  With over 130 members, **Blockchain Association** is the largest nonprofit membership organization dedicated to promoting a pro-innovation policy environment for the digital asset industry. **The Crypto Council for Innovation** is a global alliance of industry leaders with a mission to communicate the opportunities presented by digital assets and demonstrate the technology's transformational potential, and to encourage responsible global regulation of digital assets to unlock economic potential, improve lives, foster financial inclusion, protect national security, and combat illicit activity.  **The Digital Chamber** is a leading blockchain and digital asset trade association, representing over 200 members and advocating for regulatory clarity, legal certainty, and the responsible growth of the digital asset economy.  **Solana Policy Institute** is a nonpartisan nonprofit focused on educating policymakers on how decentralized networks like Solana are the future of the digital economy and why the people building on and using them need legal certainty to flourish.

1

**The Uniswap Foundation** is a nonprofit dedicated to creating a more open and fair financial system by supporting innovation across the Uniswap community and decentralized finance as a whole. Together, amici represent a broad swath of the cryptocurrency industry.

Amici have a significant interest in ensuring that cryptocurrency software developers, businesses, and users are subject to clear rules—particularly ones that carry criminal sanctions—in order to promote healthy innovation and growth in the U.S. cryptocurrency industry. The Government's new, erroneous, and overbroad interpretation of § 1960 to prosecute developers of non-custodial software enabling people to engage in peer-to-peer transactions is chilling that innovation. As amici can attest, software developers faced with the threat of criminal prosecution under the Government's new interpretation of § 1960 will cease creating new technologies long thought to be lawful. Legal clarity is critical to the industry's growth, and amici have a significant interest in a declaratory judgment to provide that clarity and to avoid subjecting more industry members to the risk of prosecution.

**INTRODUCTION**

The Government is actively prosecuting multiple developers of peer-to-peer cryptocurrency software under 18 U.S.C. § 1960 for operating "unlicensed money transmitting businesses." *See United States v. Storm*, No. 23-cr-0430 (S.D.N.Y.); *United States v. Rodriguez*, No. 24-cr-0082 (S.D.N.Y.). In doing so, the Government has adopted an unprecedented, sweeping interpretation of § 1960 that covers developers of cryptocurrency software *even if* those developers simply publish open-source software that allows people to independently execute transactions, and *even if* those developers never have custody or control over the funds.

By its plain meaning, § 1960 does not stretch that far. To fall under § 1960's criminal prohibitions, a defendant must have engaged in "money transmitting"—which the statute defines to mean "transferring funds on behalf of the public by any and all means." 18 U.S.C. § 1960(b)(2). As common sense dictates (and Department of Treasury guidance confirms), one cannot "transmit" or "transfer" funds on someone's behalf without *accepting* and *relinquishing* custody or control over the funds in the process. As a result, the statute does not apply to software developers who merely create software tools that allow *others* to engage in direct, peer-to-peer transactions. If the software developer never accepts custody or control of the cryptocurrency, then the developer cannot pass it along to someone else and by definition does not "transmit" or "transfer" it. Rather, the software created by the developer merely acts as a neutral tool that is employed by *third-party users* who engage in the transfer of funds themselves.

3

The prosecution of software developers under § 1960 flouts the plain meaning of the statute.  It also disregards basic principles of American law by attempting to hold developers of products liable for the independent acts of others who use them.  This is no different from holding firearm companies liable for gun crimes, car companies liable for speeding, or telecom providers liable for criminal conspiracies hatched over the phone. Although the ongoing prosecutions have focused on software developers in the cryptocurrency space, the principles underlying those prosecutions—holding developers responsible for the conduct of third parties they do not control—apply equally to developers of neutral technology in every industry.

The Government's aggressive prosecutions under § 1960 have sent shockwaves through the cryptocurrency industry, particularly because they contradict regulatory guidance on which the industry has long relied.  The sweeping reading of § 1960 underpinning those prosecutions has cast a cloud of uncertainty over cryptocurrency software developers, stifling development that is critical to the industry's growth.  As developers face the fear of prosecution (despite complying with past government guidance), they will either cease innovating or simply move offshore.  In this situation, a declaratory judgment is appropriate to restore the legal clarity that the cryptocurrency industry needs to thrive.

## ARGUMENT

### I.    SOFTWARE DEVELOPERS DO NOT "TRANSMIT" MONEY.

Section 1960 applies only to those who engage in "money transmitting," which requires accepting custody or control of the sender's money before relinquishing it to the

recipient. The law was enacted to be the criminal enforcement mechanism for the regulation of banks and other financial institutions, which transfer money by accepting it from one party and sending it to another. By contrast, a developer of peer-to-peer cryptocurrency software that never takes custody or control over anyone's money does not engage in the act of "money transmitting." Instead, those developers simply create and publish a neutral software tool that, at most, allows individuals to perform any number of self-directed tasks, including conducting transactions on their own behalf.

### A. Section 1960 Applies Only to Those Who Exercise Custody or Control over Others' Funds.

Section 1960 imposes criminal penalties on anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960. Under the statute, a money transmitting business can be "unlicensed" in one of three ways: if it transmits money without required state licenses, *id.* § 1960(b)(1)(A); if it transmits money without complying with federal registration requirements, *id.* § 1960(b)(1)(B); or if it transmits money known to be derived from or intended for unlawful activity, *id.* § 1960(b)(1)(C). To violate any of those three provisions, the business must be engaged in "money transmitting"—defined to mean "transferring funds on behalf of the public by any and all means." *Id.* § 1960(b)(2).

The plain meaning of that term requires the actor to have possession or control over the thing it transmits or transfers, like a traditional bank does when it accepts funds from one party and transfers them to another. To "transfer" an asset, one must "convey," "pass or hand over," or "remove" it. *Transfer*, Black's Law Dictionary (12th ed. 2024); *see also*

5

*transmit*, Black's Law Dictionary (12th ed. 2024) ("send or transfer").  And it is simple common sense that one cannot convey, hand over, or remove an asset without first (or, indeed, ever) having possession or control of it.  Therefore, for a business to "transmit" or "transfer" funds, the business must have control over the funds—if even for a moment— before passing them on.  *See, e.g.*, *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 71 (2d Cir. 2009) (electronic funds transfers "are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank").

Until recently, federal courts have consistently understood the meaning of "money transmitting" under § 1960 to require custody or control.  *See, e.g.*, *United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999) ("A money transmitting business *receives* money from a customer *and then … transmits* that money to a recipient.") (emphases added); *United States v. Bah*, 574 F.3d 106, 108 (2d Cir. 2009) ("Bah *received* money in New York *for transmittal* abroad.") (second emphasis added); *United States v. Faiella*, 39 F. Supp. 3d 544, 546 (S.D.N.Y. 2014) ("Faiella *received* cash deposits from his customers *and then … transferred* those funds to the customers' accounts on Silk Road.") (emphases added).

In recognition of that plain meaning, the Bank Secrecy Act ("BSA")—which governs the registration of financial institutions including money transmitting businesses— and official guidance of the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") focus on custody and control when determining if an entity is a "money transmitter."  The BSA and FinCEN require registration as a money transmitting service only if a business actually transmits money by "*accepting* currency … *and*

*transmitting* [it] by any means."  31 U.S.C. § 5330(d)(2) (emphases added); *see also* 31 C.F.R. § 1010.100(ff)(5)(i) (requiring businesses to register if they "accept[] … and … transmi[t]" funds "to another location or person by any means").

FinCEN's 2019 guidance, which applies the BSA specifically to cryptocurrency, is even more explicit: Cryptocurrency wallet providers must be registered under the BSA only if they have, among other things, "total independent control over the value."  FinCEN, FIN-2019-G001, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies* (May 9, 2019) ("FinCEN 2019 Guidance"), § 4.2.  Likewise, FinCEN's guidance clearly states that registration is required only for those "*receiving* one form of value … *and transmitting* [it] to another person or location." *Id.* § 2 (emphases added).[2]  FinCEN regulators have thus explained—in direct conversation with government prosecutors—that "FinCEN's guidance has generally focused on custody of cryptocurrency."  *See* Letter to Judge Berman at 3, *Rodriguez*, No. 24-cr-0082 (May 5, 2025), Dkt. No. 86.

As a result, software developers who merely create software tools but never themselves receive or take control over other people's cryptocurrency do not need to register at the federal level.  Indeed, FinCEN registration regulations explicitly exempt those who provide "the delivery, communication, or network access services used by a

---

[2] *See, e.g.*, *id.* § 3 (registration is required for "[p]ersons *accepting and transmitting* [cryptocurrency]"); *id.* § 4.2.1 (registration is required for hosted wallet providers that "*receive*, store, *and transmit* [cryptocurrency] on behalf of their accountholders"); *id.* § 4.3 (registration is required for electronic terminals that "*accept* currency from a customer *and transmit* the equivalent value"); *id.* § 4.4 (registration is required for decentralized applications that "*accept and transmit* value"); *id.* § 4.5.1 (registration is required for anonymizing services that "*accept* [cryptocurrencies] *and retransmit* them").

7

money transmitter," 31 C.F.R. § 1010.100(ff)(5)(ii)(A)—in other words, those who merely "suppl[y] [the] tools (communications, hardware, or software) that may be utilized in money transmission," FinCEN 2019 Guidance § 4.5.1(b).  And FinCEN explains that a "developer" of "a software application" is not subject to registration requirements for simply "creating or selling the application" (unless, of course, the developer "also uses" the application to "accept[] and transmit[] currency" for others).  *Id.* § 1.1; *see also id.* § 5.2.2 ("[T]he developer of a [decentralized application] is not a money transmitter for the mere act of creating the application, even if [its] purpose" is to "facilitate [cryptocurrency] activities.").

That emphasis on custody and control is not unique to the BSA and FinCEN registration requirements.  Rather, the BSA and FinCEN's emphasis on custody and control is simply a recognition of what it means to "transmit" money.  And that same ordinary meaning applies to the definition of "money transmitting" under § 1960.  *See* 18 U.S.C. § 1960(b)(2).  Therefore, to be subject to prosecution under § 1960 for "unlicensed money transmitting"—under any of the statute's three prohibitions—a person must have taken custody or control of another person's funds.

### B.   Developers of Non-Custodial Cryptocurrency Software—Who Never Take Control of Assets—Do Not Transmit Funds on Behalf of Others.

Certain types of software called "smart contracts," like those at issue here, are "computer program[s] that [are] uploaded onto the blockchain network … to automatically perform tasks, such as executing transactions, transferring cryptocurrency assets, and creating new smart contracts, once prompted by a user." *Van Loon v. Dep't of the Treasury*,

122 F.4th 549, 555 (5th Cir. 2024); *see* Compl. ¶¶ 37-38, 45-46, Dkt. No. 1.  "[S]mart contracts are self-executing, self-enforcing code," meaning that when prompted, the smart contract "auto-executes, without the need for third-party intervention from banks, lawyers, accountants," or the developer.  *Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 202, 215 (S.D.N.Y. 2023), *aff'd in part and vacated in part on other grounds*, 2025 WL 615185 (2d Cir. Feb. 26, 2025).

"Non-custodial" smart contracts facilitate peer-to-peer cryptocurrency transactions directly between users—maintaining the users' sole responsibility over their assets and "not ever [taking] custody, possession, or control of [a user's] digital assets at any time." *Id.* at 208; *see* Compl. ¶¶ 47-48.  And smart contracts are designed to be "immutable" by default, meaning that once a developer publishes the software code for public use, the code cannot be changed, controlled, or owned by anyone—including the developer.  *Van Loon*, 122 F.4th at 555, 565; *see* Compl. ¶ 49.

The mere *creation* of this type of software—a publicly available tool that enables peer-to-peer transactions—falls far outside the bounds of § 1960.  Because the developer of such software never takes custody or control of any assets, the developer does not "transmit" or "transfer" any assets.  Once the developer publishes the software, any person can use it to "automatically perform tasks" such as "transferring cryptocurrency assets" directly to a recipient.  *Van Loon*, 122 F.4th at 555.  The users of the software, however, retain full custody and control of their cryptocurrency until they send it to a recipient—all without the developer (or even the software itself) ever accepting or receiving possession or control of the cryptocurrency in the interim.  Thus, *the developer* does not transfer assets

9

on anyone's behalf. Rather, the software merely acts as a neutral tool to enable *the user* to transfer their own assets.

## II.    THE GOVERNMENT IS WRONGLY PROSECUTING DEVELOPERS UNDER A NOVEL AND SWEEPING INTERPRETATION OF § 1960.

Despite § 1960's clear limits, the Government is actively prosecuting developers of peer-to-peer software for "unlicensed money transmitting." *See, e.g.*, Superseding Indictment, *Storm*, No. 23-cr-0430 (Nov. 18, 2024), Dkt. No. 109; Superseding Indictment, *Rodriguez*, No. 24-cr-0082 (Jun. 24, 2025), Dkt. No. 109. The defendants in *Storm* and *Rodriguez* are computer programmers who developed non-custodial and immutable software programs that allow users to engage in self-directed transactions. Because all cryptocurrency transactions and balances on public blockchains are viewable to anyone with an internet connection, these developers created technological solutions that provide cryptocurrency owners a measure of privacy by anonymizing transactions.

For example, the software at issue in the *Storm* case, Tornado Cash, allows owners to use their private key to perform a transaction in which the sending address and receiving address are not directly linked on the blockchain. The owner first sends digital assets into a pool on the public blockchain, and then uses their same private key to direct the software to automatically transfer their assets from the pool to a recipient. *See How Does Tornado Cash Work?*, Coin Center (Aug. 25, 2022), bit.ly/4278bzy. Because nobody—not the software, not the developer—has access to the owner's key, the owner maintains complete custody and control over their cryptocurrency until the moment it is transferred to the recipient. *Id.*

To support its prosecutions in *Storm* and *Rodriguez*, the Government has adopted a novel and sweeping interpretation of § 1960. Specifically, it has repeatedly asserted its view that "'control' of the funds being transferred" is "not require[d]" to be a "money transmitter" under § 1960. Opp. to Mot. to Dismiss at 24, *Storm*, No. 23-cr-0430 (Apr. 26, 2024), Dkt. No. 53; *see also* Opp. to Mot. to Dismiss at 26, *Rodriguez*, No. 24-cr-0082 (Jun. 26, 2025), Dkt. No. 118 ("Custody of the funds … is not a requirement to being a money transmitter under Section 1960."). Instead, in the Government's view, the mere creation of peer-to-peer software that allows its users to transfer cryptocurrency constitutes unlicensed "money transmitting" on the theory that it "causes" independent third parties' funds to pass from one person or place to another. Opp. to Mot. to Dismiss at 28, *Storm*, No. 23-cr-0430; *see also id.* at 24-25.

The Government's arguments in those cases are wrong. For example, the Government asserts that a "transfer" need not involve any control, as a USB drive can transfer data between devices or a frying pan can transfer heat from a stove. *Id.* at 24. But the Government ignores critical context. For one, in § 1960(b)(2), the "transfer" must be "on behalf of" someone else—and acting on behalf of others requires agency that USB drives and frying pans do not have. *See* Daniel Barabander, Amanda Tuminelli, & Jake Chervinsky, *Through the Looking Glass: Conceptualizing Control and Analyzing Criminal Liability for Unlicensed Money Transmitting Businesses under Section 1960*, International Academy of Financial Crime Litigators (Dec. 2024), at 21. For another, it is incongruous to compare the transfer of something as amorphous as heat or electricity to the transfer of "funds" like cryptocurrency—which has a clear owner at all times. *See id.* at 20-21. And

in any event, the Government's strained analogies do not work even on their own terms. A USB drive receives and holds data from one device before transferring it to another. And a frying pan absorbs heat from the stove before transferring it to food. Software developers, by contrast, do not possess or hold assets that are transferred using their software. The developers are analogous to the *manufacturers* of USB drives or frying pans. Since they merely make the tools that other people use to make transfers, they are not involved in the transfers themselves.

The Government also wrongly claims that a "transfer" under § 1960 can include anything that "causes" a conveyance. Opp. to Mot. to Dismiss at 14-25, 28, *Storm*, No. 23-cr-0430. That, however, cannot possibly be correct. Otherwise, computer manufacturers and internet service providers could be held responsible under § 1960 too, since they also provide technology that causes transfers to occur. The Government's only response is that the internet is a "general network," while the relevant software's "only function [is] to provide transfers of funds." *Id.* at 34. But that is irrelevant to the Government's causation argument. A car's only function is to drive, but that does not mean that a car manufacturer operates a driving business—much less that the manufacturer is responsible for drivers' speeding tickets.

In sum, the Government's view is that a developer of peer-to-peer cryptocurrency software can be held responsible for "transmitting" money without a license, 18 U.S.C. § 1960(b)(1)(A), "transmitting" money without registering, *id.* § 1960(b)(1)(B), or "transmitting" money known to involve criminal activity, *id.* § 1960(b)(1)(C)—even though the developer simply provides a neutral tool for *other people* to transmit money. In

12

other words, the Government seeks to "effectively hold [a general services] provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them." *Twitter v. Taamneh*, 598 U.S. 471, 503 (2023). That interpretation "run[s] roughshod over the typical limits" of the law. *Id.* Creating and publishing a neutral tool does not render the developer responsible for anyone who then uses that tool to transmit money themselves.

Despite those significant weaknesses in its position, the Government has only become further emboldened. In *Storm*, when considering a motion to dismiss the indictment, the district court agreed with the Government that custody or "control is not a necessary requirement" to be a "money transmitter" under § 1960. Tr. of Hr'g on Mot. to Dismiss at 21, *Storm*, No. 23-cr-0430 (Sept. 26, 2024), Dkt. No. 99. The court has therefore allowed the *Storm* prosecution to proceed. *See id.* at 4.

But the district court's holding likewise rests on faulty reasoning. For example, the district court observed that FinCEN's guidance uses the word "control" "in the context of … determining whether a *wallet provider* is a money transmitter," and the court therefore concluded that custody or control is not a relevant factor for *other* types of cryptocurrency businesses discussed in the guidance. *Id.* at 22 (emphasis added). That is an erroneous conclusion to draw. As explained, FinCEN's guidance repeatedly reiterates that cryptocurrency businesses are money transmitters only if they "accept" or "receive" funds, *see supra* at 7 & n.2—and that is just another way of saying that transmitting requires custody or control. Thus, custody and control are themes that pervade FinCEN's guidance for all types of cryptocurrency software.

13

The district court further discounted FinCEN's focus on control because, in the court's view, "the definitions of 'money transmitting' in Sections 1960 and [the BSA and FinCEN regulations] are [not] co-extensive." Tr. of Hr'g on Mot. to Dismiss at 20, *Storm*, No. 23-cr-0430; *see also* Opp. to Mot. to Dismiss at 15-18, *Rodriguez*, No. 24-cr-0082. But that too ignores that the definition of "money transmitting" *in § 1960* requires "transferring funds on behalf of the public"—and one cannot transmit or transfer funds on someone else's behalf without accepting custody or control over those funds. 18 U.S.C. § 1960(b)(2); *see supra* at 5-6. The BSA and FinCEN's guidance simply confirm the ordinary understanding of those terms.

And finally, the district court's reliance on the purported "purpose of Section 1960"—"to 'keep pace with evolving threats' as new methods of moving criminal proceeds emerged over time"—was also misguided. Tr. of Hr'g on Mot. to Dismiss at 23, *Storm*, No. 23-cr-0430 (quoting *Faiella*, 39 F. Supp. 3d at 546 (alteration omitted)); *see also* Opp. to Mot. to Dismiss at 29, *Rodriguez*, No. 24-cr-0082. Statutes must be interpreted according to their text, and if there is some statutory "purpose" that the text does not achieve, then the proper solution is for Congress to alter the text so that the underlying purpose can be more fully served. Courts do not have license to rewrite statutory text in service of whatever they perceive the underlying statutory purpose to be. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 57 (2012); *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 282 (2018).

*Faiella* does not suggest otherwise. There, the district court said that statutory purpose could be helpful to resolve statutory ambiguity, 39 F. Supp. 3d at 545-46, but it

14

did not suggest that statutory purpose can be used to *override* the plain meaning of a term like "transmitting" money. To the contrary, the court found the defendant there to be a Bitcoin "transmitter" under § 1960 only after finding that the defendant "*received* cash deposits from his customers *and then*, after exchanging them for Bitcoins, *transferred* those funds to the customers' accounts"— depriving the users of "full control over the Bitcoins" during the process. *Id.* at 546 (emphases added). Thus, *Faiella* does not justify expanding § 1960's clear definition of "money transmitting" to cover those who never have custody or control over funds and could not "transmit" funds under any ordinary meaning of the term.

III.   **THE GOVERNMENT'S IMPROPER INTERPRETATION OF § 1960 IS CHILLING INNOVATION IN THE CRYPTOCURRENCY INDUSTRY.**

The Government's new theory of broad criminal liability under § 1960 repudiates a long-established understanding that has guided law-abiding developers in the cryptocurrency industry for years. As a result, members of the industry now widely fear similar prosecutions against them. That fear is undermining the industry's confidence in the rule of law; chilling development of and investment in neutral, lawful cryptocurrency tools; and stifling the industry's growth. In such circumstances, declaratory relief is necessary and appropriate.

A.   **The Government's § 1960 Prosecutions Have Generated Legal Uncertainty, Chilling Development of Lawful Cryptocurrency Tools.**

Before the Government began prosecuting cryptocurrency software developers under its novel approach, members of the industry widely relied on § 1960's plain and settled meaning to ensure their actions were lawful. For example, industry actors and their

legal counsel have long relied on FinCEN's guidance to order their businesses and to ensure that their operations comply with the law.[3]  And as explained, virtually everyone—including FinCEN itself—has always operated on the understanding that an entity does not become a money "transmitting" business unless it exercises some control or "custody of cryptocurrency."  *See* Letter to Judge Berman at 3, *Rodriguez*, No. 24-cr-0082; *see also* Letter from Coalition of Industry Participants, *supra*, at 2; Barabander, Tuminelli, & Chervinsky, *Through the Looking Glass*, *supra*, at 13-17.

But the Government has now renounced that longstanding consensus on § 1960's reach, arguing that "FinCEN Guidance … has no authoritative effect" on what § 1960 requires and that "'money transmitting' in Section 1960 does not require the money transmitter to have 'control' of the funds being transferred."  Opp. to Mot. to Dismiss at 24, 33, *Storm*, No. 23-cr-0430; *see also* Opp. to Mot. to Dismiss at 15, 18-19, 26, *Rodriguez*, No. 24-cr-0082.

---

[3] *See* Letter from Coalition of Industry Participants to Tim Scott et al. at 2 (Mar. 26, 2025), http://bit.ly/46tARqc ("The industry has followed this Guidance in good faith for over five years.  It is not hyperbole to say it is one of if not the most important legal cornerstone supporting the development of this multi-billion dollar industry."); *see also, e.g.*, Benjamin Gruenstein, Evan Norris, & Daniel Barabander, *Assessing the Tornado Cash Indictment against FinCEN's 2019 Guidance Applying Money Transmission Rules to Crypto Businesses*, NYU School of Law (Oct. 26, 2023), http://bit.ly/4kOmK3a; DeFi Education Fund, *AML/CFT Part 1: Where Government Meets DeFi* (Aug. 20, 2022), http://bit.ly/46bv5th; Mike Nonaka, Jenny Konko, & Cody Gaffney, *FinCEN Issues Guidance to Synthesize Regulatory Framework for Virtual Currency*, Covington & Burling LLP (Nov. 2019), https://bit.ly/3GcgG5q; Mark W. Rasmussen et al., *FinCEN Consolidates Guidance on Virtual Currencies*, Jones Day (Jun. 2019), https://bit.ly/3G8mOf9; Satish M. Kini et al., *Applying the Bank Secrecy Act Framework to Convertible Virtual Currency*, Debevoise & Plimpton LLP (May 28, 2019), http://bit.ly/4675di6; Mirella A. deRose, *Tying It All Together: FinCEN Consolidates Several Years of Cryptocurrency Guidance*, King & Spalding (May 21, 2019), https://bit.ly/3HT7rry; Jeremy B. Zucker et al., *FinCEN, Treasury Dep't Affirm Regulatory Regime for Convertible Virtual Currencies*, Dechert LLP (May 2019), http://bit.ly/4kXc96d; Peter Van Valkenburgh, *FinCEN's New Cryptocurrency Guidance Matches Coin Center Recommendations*, Coin Center (May 9, 2019), https://bit.ly/4k5QfMP; Marco Santori, *What is Money Transmission and Why Does it Matter?*, Coin Center (Apr. 7, 2015), https://bit.ly/3HRYgrj.

The Government's about-face leaves developers exposed to the risk of criminal prosecution for engaging in behavior long believed to be lawful.  The Government's new expansive interpretation of § 1960 to prosecute cryptocurrency software developers has roiled the cryptocurrency industry, fueling widespread uncertainty and fear of similar prosecution.  As a bipartisan partnership of Senators put it, the Government's reversal "makes it difficult for ordinary Americans to determine what their legal obligations are." Letter from Cynthia M. Lummis & Ron Wyden to Merrick Garland at 2 (May 9, 2024), http://bit.ly/40yn4Lm.  And that uncertainty and fear of criminal prosecution is actively stymying innovation and development of new cryptocurrency tools.[4]

Faced with possible prosecution for operating an "unlicensed money transmitting business," developers of peer-to-peer cryptocurrency transfer software will choose to either

---

[4] *See, e.g.*, Letter from Coalition of Industry Participants, *supra*, at 3 ("The resulting, and very rational, fear among developers would effectively end the development of these technologies in the United States."); Brief of DeFi Education Fund and Blockchain Association as Amici Curiae in Support of Defendants' Motion to Dismiss at 14, *United States v. Rodriguez* (Jun. 5, 2025) (unfiled), *available at* https://bit.ly/40AV3mj ("The government's abrupt contradiction of its own longstanding position has disturbing implications for software developers everywhere and, unsurprisingly, has profoundly chilled innovation."); Jason Brett, *Roman Storm Case: Will Jailing a Coder Stifle U.S. Crypto Growth?*, Forbes (Jan. 30, 2025), http://bit.ly/3TzWTQy ("The chilling effect on crypto developers based on the outcome of Storm's case could set a dangerous precedent, particularly for those working on decentralized applications, privacy tools, and DeFi."); Brief of Electronic Frontier Foundation as Amicus Curiae in Support of Roman Storm's Motion for Reconsideration at 2-3, *Storm*, No. 23-cr-0430 (Jan. 28, 2025), Dkt. No. 122-1 ("Those developers [of open-source software] are concerned that the government's aggressive arguments here could implicate their own work."); I. Priess & A. Gilbert, *Why Privacy Advocates Argue the Conviction of Tornado Cash Dev Alexey Pertsev 'Harms Everyone'*, DLNews (May 16, 2024), http://bit.ly/4k927xE ("There's been more hesitation to develop in the US and I know a lot of developers and entrepreneurs are thinking about moving outside the US, which is a very unfortunate outcome."); Nicholas Anthony, *Samourai Charges Mark Chilling Moment for Financial Privacy*, Cato Inst. (Apr. 30, 2024), http://bit.ly/3GwQnHq (noting crypto developers' "departure from US markets" after the *Rodriguez* indictment); Peter Van Valkenburgh, *DOJ's New Stance on Crypto Wallets is a Threat to Liberty and the Rule of Law*, Coin Center (Apr. 29, 2024), http://bit.ly/4kOsABC ("[I]t has come as quite a surprise that the Department of Justice is suddenly intent on charging wallet developers criminally for unlicensed money transmission even if they exercise no actual control over the assets their users choose to secure with their software.").

move offshore or stop creating their tools altogether. *See* Letter from Coalition of Industry Participants, *supra*, at 3. That is because it is often impossible for those developers to avoid prosecution by complying with the BSA and § 1960's requirements for money transmitting businesses. For example, to comply with federal registration requirements under § 1960(b)(1)(B), the registrant must name the person who "owns or controls the business." 31 U.S.C. § 5330(b)(2). But software developers who simply publish smart contracts for anyone's use—but "ha[ve] no control over" the software—do not own or control a business at all, as such software itself is "not capable of being owned." *Van Loon*, 122 F.4th at 565, 569.

The BSA also requires money transmitters to collect customer information, report suspicious activity, and implement anti-money laundering safeguards, which may require blocking fraudulent transactions. 31 U.S.C. § 5318; 31 C.F.R. §§ 1022.210, 320; *see, e.g.*, Compl. ¶¶ 4-5, *Dep't of Treasury v. Haider*, No. 14-cv-9987 (S.D.N.Y. Dec. 18, 2014), Dkt. No. 1 (alleging that money transmitting business violated BSA by failing to "terminate[] agents and outlets that [it] understood were involved in fraud and/or money laundering"). But again, those requirements do not make sense as applied to software developers who simply release software into the world, after which third parties can independently use it. Those software developers are incapable of identifying users, controlling funds, or blocking any transactions. *See* Compl. ¶ 56. At its core and by design, blockchain technologies, including peer-to-peer software, obviate the need for traditional financial intermediaries. Thus, it is impossible to comply with the BSA's anti-money laundering requirements, particularly Know Your Customer and other reporting

18

requirements, without completely reconstituting those decentralized networks and software back into a traditional intermediary capable of meeting these obligations. That would effectively destroy the very nature of the technology and its core goal of enabling user-controlled activity.

The Department of Justice's recent memorandum on cryptocurrency prosecutions does little to solve the problem. *See* Memorandum from Deputy Att'y Gen. Todd Blanche to All Department Employees (Apr. 7, 2025), http://bit.ly/3IhmECT ("DOJ memorandum"). Despite the DOJ memorandum's stated policy of "ending regulation by prosecution" in the cryptocurrency industry by "no longer target[ing] virtual currency … services … for the acts of their end users or unwitting violations of regulations," *id.* at 1 (capitalizations omitted), the Government's sweeping interpretation of § 1960(b)(2) persists. Indeed, after the DOJ memorandum, the prosecutors in *Storm* have doubled down on their view that custody or control is not required to be a "money transmitter" under § 1960(b)(2). *See, e.g.*, *Brady* Hr'g (May 30, 2025), *Storm*, No. 23-cr-0430. They allege that continuing to prosecute Storm "is consistent with the letter and spirit of the April 7, 2025 Memorandum from the Deputy Attorney General." Letter from U.S. Attorney to Judge Failla, *Storm*, No. 23-cr-0430, Dkt. No. 144. As a result, developers of other peer-to-peer cryptocurrency software (rightfully) believe that the DOJ memorandum will do nothing to protect them from similar prosecution under § 1960—and that their only option to avoid the risk of prosecution is to simply cease development altogether.

19

**B.      Declaratory Relief Is Appropriate to Settle § 1960's Meaning Without Requiring Law-Abiding Developers to Face the Risk of Incarceration.**

Pre-enforcement review under the Declaratory Judgment Act is the only way to solve the problem that cryptocurrency developers currently face.  A case is ripe for pre-enforcement review where "[t]he government's action would reasonably prompt a regulated industry, unwilling to risk substantial penalties by defying the statute, to undertake costly compliance measures or forego a line of business." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 287 (6th Cir. 1997).  "Absent the availability of pre-enforcement review, [the regulated industry members] must either terminate [or abstain from] a line of business, make substantial expenditures in order to comply with the Act, or willfully violate the statute and risk serious criminal penalties." *Id.*

That is the case here.  As long as developers of peer-to-peer cryptocurrency software—like Lewellen—fear prosecution under the Government's overbroad view of § 1960, they will forgo creating new peer-to-peer cryptocurrency tools that are critical to the industry's growth. *See supra at* 17-19.

And the developers' fear is well-founded:  The Government has made crystal clear that it views developers of non-custodial, peer-to-peer cryptocurrency software as falling within § 1960(b)'s scope.  Most pertinently, the *Storm* and *Rodriguez* cases are "a clear shot across the bow," *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 927 (5th Cir. 2023), conveying to developers of peer-to-peer cryptocurrency software that they can be prosecuted under § 1960 regardless of custody or control.  As a result of those high-profile prosecutions—and especially given the Government's continued pursuit

20

of those prosecutions after the DOJ memorandum—other cryptocurrency developers are now "justified in believing" that the Government will enforce § 1960 against other developers. *Id.*; *see id.* (explaining that even "one case, especially one landmark case, … can be considered a history of enforcement" and "readily establish a credible threat" to similar practices).

That is especially so where, as here, the previous prosecutions are accompanied by "a public announcement to enforce a statute." *Id.* at 928 (quotation marks and alterations omitted). The day after Rodriguez's arrest, the Government published an alert emphasizing that it "has recently conducted law enforcement operations against cryptocurrency services which were not licensed in accordance with federal law," advising citizens not to use unregistered or unlicensed cryptocurrency software, and strongly suggesting that it anticipates taking further "law enforcement actions" against such cryptocurrency services. *Public Service Announcement: Alert on Cryptocurrency Money Services Businesses*, Alert No. I-042524-PSA, FBI (Apr. 25, 2024). And worse, despite the DOJ memorandum and despite this case, the Government still has "refus[ed] to disavow future enforcement against" developers like Lewellen—making pre-enforcement review especially appropriate. *Umphress v. Hall*, 133 F.4th 455, 466 (5th Cir. 2025); *see* Compl. ¶ 91.

Cryptocurrency software developers' legitimate fear of prosecution is casting a chill over development and innovation across the entire industry. In such a situation, "[t]here are no advantages to the court to be gained from withholding judicial review at the present time and waiting until" more cryptocurrency software developers have "been prosecuted under the Act." *Nat'l Rifle Ass'n*, 132 F.3d at 287. Members of the cryptocurrency industry

21

"are entitled to receive clarification from this court before stifling their [lawful] practices or otherwise exposing themselves to punishment." *Braidwood*, 70 F.4th at 927-28. "That is a core purpose of a declaratory judgment." *Id.* at 928.

## CONCLUSION

For those reasons, the Court should deny the Defendant's motion to dismiss the Plaintiff's complaint.


Respectfully submitted, on July 7, 2025.

/s/ *Mark W. Rasmussen*

Mark W. Rasmussen
Texas Bar No. 24086291
JONES DAY
2727 North Harwood Street
Dallas, TX 75201
Telephone: (214) 969-4892
Facsimile: (214) 969-5100
mrasmussen@jonesday.com

Anthony J. Dick
Avery R. Phillips
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Telephone: (202) 879-7679
ajdick@jonesday.com


*Counsel for Amici Curiae*

22

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and distribution to all registered participants of the CM/ECF System.

/s/ *Mark W. Rasmussen*

Mark W. Rasmussen